**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**EASTERN DIVISION**

---

| | | |
|---|---|---|
| **CAREY W. FRIX, M.D.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **vs.** | ) | |
| | ) | **No. 1:16-cv-02559-STA-egb** |
| **INTEGRITY MEDICAL** | ) | |
| **SYSTEMS, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

---

### ORDER GRANTING PLAINTIFF'S MOTION FOR
### PARTIAL SUMMARY JUDGMENT

---

Like many others before it, this case arises from a soured business transaction. Plaintiff Carey W. Frix, M.D., a Tennessee physician, moves the Court for entry of summary judgment against Defendant Integrity Medical Systems, Inc., a Florida-based dealer of medical imaging equipment, on the sole issue of liability for breach of contract. Plaintiff's Motion presents the Court with a number of issues that range from questions of conflicts of law to those of contracts. And all of these issues fundamentally lead toward answering a single question: do the terms of the Purchase Agreement control the contract at the center of the parties' dispute? Plaintiff, having neither seen nor signed the Purchase Agreement, appeals to common sense and argues that they do not. But Defendant comes to the Court bearing the thicket that is the Uniform Commercial Code and asks the Court to wade into the tangled brambles of the Code's provisions that favor contract formation over clarity. To resolve this case, the Court must so wade.

For the reasons set forth below, Plaintiff's Motion for Partial Summary Judgment is **GRANTED**.

## I.    BACKGROUND[1]

Plaintiff, as the owner and operator of several medical clinics throughout west Tennessee, wanted to expand the services at his clinics to include mammography.  In order to do so, Plaintiff specifically sought to place a 64-slice CT scanner, then located at his Henderson clinic, inside a mobile trailer with the new mammography equipment.  Plaintiff owned the mobile trailer, but it was currently occupied by a 4-slice CT scanner.  Plaintiff sought to solve all of these issues at once and solicited bids from three medical equipment companies (1) to uninstall and remove the four-slice CT scanner from his trailer, (2) to transport and install the 64-slice CT scanner inside that same trailer, and (3) for new mammography equipment that would also be installed in the trailer.  Defendant ultimately submitted the lowest bid to Plaintiff.  Though the parties disagree on the legal results of what occurred next, they do not dispute that informal discussions took place.  Nor do they dispute that the discussions eventually resulted in a contract between the parties (the "Contract").  Plaintiff alleges he simply accepted Defendant's bid and e-mailed David Denholtz, owner of Defendant, to confirm the terms of the deal:

> David,
>
> To confirm –
> 65k for [the mammography equipment], installed
> 17.5k to install [the 64-slice CT scanner]
> 25k trade in on [the four-slice CT scanner]
>
> End result 57.5 plus [the four-slice CT scanner] to you, [the 64-slice CT scanner] and [the mammography equipment] installed in my trailer[.]
>
> Is that correct?  Do you have a timeframe to complete?

---

[1] The following facts are not disputed by the parties unless otherwise noted.  *See* Statement of Undisputed Material Facts in Supp. of Pl.'s Motion for Partial Summ. J., Mar. 15, 2017, ECF No. 28-3 [hereinafter "Pl.'s Statement of Facts"]; Def. Integrity Medical Systems, Inc.'s Resp. to Pl.'s Statement of Undisputed Material Facts and Statement of Additional Facts in Opp'n to Pl.'s Motion for Summ. J., Aug. 4, 2017, ECF No. 49 [hereinafter "Def's Statement of Facts"].

Thanks…cf

Pl.'s Statement of Facts, ¶ 12 (quoting Exhibit 1 – Decl. of Carey W. Frix, M.D., Ex. A, Mar. 15, 2017, ECF No. 28-4 [hereinafter "Frix Decl."]). To which Denholtz replied: "Yes, correct." *Id.* ¶ 13 (quoting Frix Decl., Ex. B). While Defendant admits the content of these e-mails, it alleges that Plaintiff accepted the terms of a Purchase Agreement that Defendant faxed to Plaintiff shortly after their e-mail correspondence (the "Purchase Agreement"). Def.'s Statement of Facts, ¶¶ 12–13 (citing Decl. of David Denholtz, Ex. C, Aug. 4, 2017, ECF No. 49-1 [hereinafter "Denholtz Decl."]; Decl. of Rhonda Johnson, ¶¶ 5–10, Aug. 4, 2017, ECF No. 49-2 [hereinafter "Johnson Decl."]). Defendant further denies that any meeting of the minds between the parties occurred regarding the terms set forth in the e-mails. *Id.*

Plaintiff sent Defendant a $14,375 deposit on May 17, 2016. A week later, Plaintiff sent Defendant an additional payment of $37,375. The payments totaled up to $51,750. A number of details, such as who knew what and when regarding an issue of cable length and what happened with a potential replacement engineer after the original engineer went back to South Carolina, are contested by the parties. *See* Def.'s Statement of Facts, ¶¶ 20–33. While the original engineer eventually returned and concluded the installation, the parties dispute whether the installation was successful. *Id.* ¶¶ 37–38. They further dispute the condition of the 4-slice CT scanner that was removed and taken by Defendant for credited value under the terms of the Contract. *Id.* ¶¶ 39–40. Defendant canceled the project by e-mail in June 2016. This cancelation still involved finishing the installation of the 64-slice CT scanner as best as Defendant could and refunding any remaining money to Plaintiff. Although the parties agree that no money was refunded to Plaintiff, Defendant claims that this is because the funds paid by Plaintiff did not cover the work performed and the parts required for that work. *See id.* ¶ 44

(citing Denholtz Decl., ¶ 15; Decl. of Ralph "Scooter" Childs, ¶ 35, Aug. 4, 2017, ECF No. 49-3 [hereinafter "Childs Decl."]).  In response to Defendant's cancellation, Plaintiff's counsel sent Defendant a demand letter of disputed admissibility.  Pl.'s Statement of Additional Undisputed Material Facts, ¶ 4, Aug. 25, 2017, ECF No. 52-2.  The letter stated as follows:

> Please be advised that I represent Dr. Carey Frix in Henderson, Tennessee.  You have informed Dr. Frix that you do not intend to complete a portion of the contract that calls for exchange of a [4-slice CT scanner] for a mammogram machine.  You have the claim that the [4-slice CT scanner] does not live up to the specifications in the contract.  However, your own installer inspected the [4-slice CT scanner] and verified that the machine was in good working order and met the specifications of the contract.
>
> However, it appears that you and Dr. Frix both desire to end this contractual relationship as soon as possible.  Therefore Dr. Frix agrees to your offer to amend the contract.  He will arrange for shipping of his machine.  However you will be responsible for the appropriate loading of the [4-slice CT scanner] and preparing it for long haul transport.  Since your employee thoroughly inspected the machine, we expect to receive it back in the same condition.  Since you refuse to ship the machine back to Dr. Frix, we expect the sum of $ 32,370.00 to be delivered immediately to Dr. Frix via wire transfer of funds.

Denholtz Decl., Ex. C.  Defendant sent the Purchase Agreement to Plaintiff, but Plaintiff did not see or sign it.  *See* Def.'s Statement of Facts, ¶ 45.


## II.     STANDARD OF LAW

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56.  When deciding a motion for summary judgment, the Court must review all the evidence and draw all reasonable inferences in favor of the nonmovant.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In reviewing a

motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party, and it "may not make credibility determinations []or weigh the evidence." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014). When the motion is supported by documentary proof such as depositions and affidavits, the nonmoving party may not rest on his pleadings but, rather, must present some "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Eastham v. Chesapeake Appalachia, L.L.C.*, 754 F.3d 356, 360 (6th Cir. 2014). These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The Court must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp*, 477 U.S. at 322.

## III.   ANALYSIS

In the instant Motion, Plaintiff seeks partial summary judgment on the single issue of Defendant's liability for breach of contract. Pl.'s Motion for Partial Summ. J., Mar. 15, 2017, ECF No. 28. The amount of damages from Plaintiff's breach of contract claim and Plaintiff's claim under the Tennessee Consumer Protection Act are not issues currently before the Court. *See* Mem. in Supp. of Pl's Motion for Partial Summ. J., at 7, Mar. 15, 2017, ECF No. 28-1 [hereinafter "Pl.'s Mem."]. Plaintiff asserts that Defendant indisputably breached the Contract as agreed to in their e-mail correspondence. The parties do not dispute the existence of the Contract. Nor do they dispute that Defendant refused to perform. Defendant, however, claims

Plaintiff breached the terms of the Purchase Agreement, which governed the Contract in its view. Def. Integrity Medical Systems, Inc.'s Mem. of Law in Opp'n to Pl.'s Motion for Summ. J., at 17–18, Aug. 4, 2017, ECF No. 49-4 [hereinafter "Def.'s Resp."]. In Defendant's view, Plaintiff's alleged breach excuses Defendant's refusal to perform. *Id.* at 19–20. While this is generally true as a matter of contract law, all of Defendant's arguments to this point invoke the Purchase Agreement. Thus, the main issue for the Court to resolve is whether the Purchase Agreement governs the Contract. To put it simply for the purposes of this Motion: if the Purchase Agreement controls, Defendant wins; if it does not, Plaintiff wins.

Disposition of Plaintiff's Motion, however, requires resolution of several other issues, some preliminary and others alternative. First, the parties raise the issue of what law governs this dispute. Second, the Court must decide the applicability of the Uniform Commercial Code. Then, the Court will reach the elements of Plaintiff's breach of contract claim, addressing a number of alternative arguments along the way. It is in determining whether Defendant breached the Contract where this case becomes bogged down. For the inquiry into whether the Purchase Agreement controls the Contract runs straight into section 2-207, a provision perhaps best likened to "an amphibious tank that was originally designed to fight in the swamps[] but was sent to fight in the desert." James J. White & Robert S. Summers, *Uniform Commercial Code* § 2-3 (6th ed. 2010). For the reasons articulated below, the Court finds as follows: (1) Tennessee law governs this action; (2) the Contract is within the scope of Article 2 of the Uniform Commercial Code; (3) the Purchase Agreement is not a part of the Contract; (4) Defendant breached the Contract; and (5) Plaintiff suffered injury as the result of Defendant's breach. Accordingly, Plaintiff has established his breach of contract claim based upon the undisputed facts of this case and is entitled to a judgment as a matter of law on that issue.

## A.      Whether Tennessee Law or Florida Law Applies

A federal court exercising diversity jurisdiction must apply the choice-of-law rules of the state in which it sits.  *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).  And it must apply the law it believes the highest court of such state would apply.  *See McClusky v. Century Bank, FSB*, 598 F. App'x 383, 386 (6th Cir. 2015) (quoting *Lutz v. Chesapeake Appalachia, L.L.C.*, 717 F.3d 459, 464 (6th Cir. 2013)); *Mahne v. Ford Motor Co.*, 900 F.2d 83, 85–86 (6th Cir. 1990).  "Absent a contractual choice of law provision, Tennessee courts apply the *lex loci* rule to contract causes of action."  *In re Estate of Davis*, 184 S.W.3d 231, 234 (Tenn. Ct. App. 2004) (citing *Solomon v. FloWarr Mgmt.*, 777 S.W.2d 701, 704–05 (Tenn. Ct. App. 1989)); *see also Ohio Cas. Ins. Co. v. Travelers Indem. Co.*, 493 S.W.2d 465, 467 (Tenn. 1973) (citation omitted) ("Tennessee conflict of laws rule [states that] . . . liability . . . under the [contract] . . . was to be governed by the *lex loci contractus* . . . .").  The Tennessee Supreme Court thought the rule to be well stated by the Sixth Circuit:

> The Tennessee conflict of laws rule provides that rights and obligations under a contract are governed by the law of that state with the view to which it is made and that the intentions of the parties in this respect to be gathered from the terms of the instruments and all of the attending circumstances control. . . .  "[A] contract is presumed to be made with reference to the law of the place where it was entered into unless it appears it was entered into in good faith with reference to the law of some other state."

*Ohio Cas. Ins. Co.*, 493 S.W.2d at 466–67 (quoting *First Am. Nat'l Bank v. Automobile Ins. Co.*, 252 F.2d 62, 64 (6th Cir. 1958)).  With the parties evidently corresponding across state boundaries, it is not entirely clear to the Court in which state the Contract was entered into.  But an older line of cases from the Tennessee Supreme Court provides a helpful rule in this instance: "If the contract is made in one place, and it is agreed to be performed in another place, the law of the place of performance, instead of the *lex loci contractus*, will govern the contract."  *Edgington*

*v. Edgington*, 162 S.W.2d 1082, 1086 (Tenn. 1942) (quoting *Hubble v. Morristown Land & Improvement Co.*, 32 S.W. 965, 966 (Tenn. 1895)). Though the Tennessee Supreme Court has not revisited the case recently, *Edgington* has been cited approvingly by both the Tennessee Court of Appeals and U.S. District Courts in the intervening decades. *See, e.g.*, *Whittaker v. Whittaker*, 2009 U.S. Dist. LEXIS 43640, at *9 (E.D. Tenn. May 21, 2009); *NGK Metals Corp v. Nat'l Union Fire Ins. Co.*, 2005 U.S. Dist. LEXIS 40603, at *19–20 (E.D. Tenn. Apr. 29, 2005); *Blane v. American Investors Corp.*, 934 F. Supp. 903, 908 (M.D. Tenn. 1996); *Solomon*, 777 S.W.2d at 705 n.5. Because the Contract was for the sale of 64-slice CT scanner, mammography equipment, and their installation in Tennessee, as well as the removal of a four-slice CT scanner from a trailer in Tennessee, Tennessee is the place of performance. The Contract was either made in Tennessee or Florida, and the Contract was to be performed on in Tennessee. It follows that the Contract should be governed by Tennessee law either because it was made in Tennessee or because it was made in Florida but to be performed on in Tennessee. Thus, the Court will proceed as if Tennessee law governs the Contract—absent a valid choice-of-law provision.[2]

### B.     Applicability of Article 2 of the Uniform Commercial Code

Article 2 of the Uniform Commercial Code (the "UCC") "applies to transactions in goods." Tenn. Code Ann. § 47-2-102. "'Goods' means all things . . . which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities[,] . . . and things in action." *Id.* § 47-2-105(1). The UCC's

---

[2] Paragraph 13 of the Purchase Agreement contains a choice-of-law provision invoking Florida law. Johnson Decl., Ex. C (emphasis added). Plaintiff argues that this provision does not apply to the Contract because the Purchase Agreement is not part of the Contract. Pl.'s Mem., at 7. Defendant asserts that the Purchase Agreement is part of the Contract and, therefore, Florida law applies. *See* Def's Resp., at 12.

provisions

> appl[y] to transactions in goods but do[] not apply to construction contracts or contracts for the rendition of services. . . . In many cases, a contract or transaction may involve both the transaction of a sale and the rendition of services, presenting a "mixed" or hybrid transaction or contract. To determine whether such "mixed" or "hybrid" contracts are governed by Article 2, a court must examine the whole transaction and look to the essence or main objective of the parties' agreement or the primary or overall purpose of the transaction.

*Audio Visual Artistry v. Tanzer*, 403 S.W.3d 789, 796 (Tenn. Ct. App. 2012) (quoting 67 Am. Jur. 2d *Sales* § 37). Under Tennessee law, courts are to apply the "predominant factor" or "predominant purpose" test in resolving whether a contract is for goods or services. *Hudson v. Town & Country True Value Hardware, Inc.*, 666 S.W.2d 51, 53–54 (Tenn. 1984) (adopting the predominant purpose test). The widely cited decision of the Eighth Circuit in *Bonebrake v. Cox* described the predominant purpose test as follows:

> The test for inclusion or exclusion is . . . whether their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service, with goods incidentally involved (e.g., contract with artist for painting) or is a transaction of sale, with labor incidentally involved (e.g., installation of a water heater in a bathroom).

499 F.2d 951, 960 (8th Cir. 1974) (citations omitted). "In order to determine . . . the predominant purpose of a mixed transaction. . . , we examine the language of the parties' contract, the nature of the business of the supplier of the goods and services, the reason the parties entered into the contract . . . , and the respective amounts charged . . . for goods and for services." *Audio Visual Artistry*, 403 S.W.3d at 798 (citation omitted).

Here, the Contract was for the sale of mammography equipment to Plaintiff, its installation, the removal of a four-slice CT scanner, its sale to Defendant, and the transportation and installation of a 64-slice CT scanner. Defendant argues that the UCC applies because this transaction involved a sale of goods in excess of $500.00 that was between merchants. Def.'s

Resp., at 12.  Led astray by Defendant's own forgivable misstep while attempting to navigate the UCC, Plaintiff only challenges the assertion that he qualifies as a merchant under the UCC. Reply in Supp. of Pl.'s Motion for Summ. J., at 2–3 n.3, ECF No. 52 [hereinafter "Pl.'s Reply"]. But as discussed above, the Tennessee UCC requires only "transactions in goods."  Tenn. Code Ann. § 47-2-102.  Defendant conflates sections 672.102 ("[T]his chapter applies to transactions in goods . . . ."), 672.201 ("[A] contract for the sale of goods for the price of $500 or more is not enforceable . . . unless there is some writing sufficient to indicate that a contract for sale has been made . . . ."), and 672.207 ("Between merchants such terms become part of the contract . . . .") of the Florida Statutes Annotated.

The parties are in agreement that Plaintiff solicited a bid for the installation of mammography equipment, removal of the four-slice CT scanner, and transportation and installation of the 64-slice CT scanner.  *See* Def.'s Statement of Facts, ¶ 8.  No description of Defendant is provided in the parties' respective statements of material facts.  In its Memorandum, Plaintiff merely describes Defendant as a "medical equipment compan[y]."  Pl.'s Mem., at 2.  Defendant, in its own Memorandum, describes itself as "a provider of high-quality new, used, and refurbished medical imaging equipment."  Def.'s Resp., at 1.  The parties agree that the reason they entered into the Contract was because Plaintiff wanted to expand his services to include mammography.  *See* Def.'s Statement of Facts, ¶ 7.  The e-mail exchange between the parties breaks down the prices as $65,000 for the purchase and installation of mammography equipment, $17,500 for the installation of the 64-slice CT scanner, and $25,000 in credit to Plaintiff for his four-slice CT scanner.  *Id.* ¶ 12.  On balance, this transaction is a sale of goods. Plaintiff's purchase of the mammography equipment appears to be the overwhelming purpose of the Contract based upon the motivation to enter into the Contract and the costs respectively

ascribed to equipment and installation. Further, the $25,000 in credit Defendant offered to Plaintiff for the 4-slice CT scanner is an additional transaction "in goods." Therefore, the Court finds that the Tennessee UCC is applicable to the Contract and assumes that it will control this dispute absent a valid choice-of-law provision.

### C.       Whether the Purchase Agreement Governs the Contract

The elements of a claim for breach of contract are (1) the existence of a contract, (2) breach of the contract, and (3) damages that flow from the breach. *Life Care Ctrs. of Am., Inc. v. Charles Town Assocs. Ltd. P'ship*, 79 F.3d 496, 514 (6th Cir. 1996); *Ingram v. Cendant Mobility Fin. Corp.*, 215 S.W.3d 367, 374 (Tenn. Ct. App. 2006) (citation omitted). As previously stated, the parties do not dispute the existence of an enforceable contract, and therefore, the first element is at least nominally satisfied. Regarding the second element, Plaintiff alleges that Defendant refused to perform its obligations under the Contract, constituting a breach. Pl.'s Mem, at 8. Defendant responds with the charge that it was Plaintiff who breached the Contract by refusing to pay costs that Plaintiff was contractually obligated to pay for under the Purchase Agreement, which in turn entitled Defendant to cancel its performance. Def.'s Resp., at 17–20. Plaintiff replies that it did not breach the Contract because the terms Defendant accuses Plaintiff of breaching were not part of the Contract. Pl.'s Reply, at 1–2. Thus, the Court must address whether the terms of the Purchase Agreement are part of the Contract before it can determine whether either party breached the Contract.

"A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." Tenn. Code Ann. § 47-2-204(1). "An agreement sufficient to constitute a contract for sale may be

found even though the moment of its making is undetermined." *Id.* § 47-2-204(2). "Unless displaced by the particular provisions of [the UCC], the principles of law and equity . . . supplement [the UCC]." *Id.* § 47-1-103(b). "Under general principles of contract law, a contract 'must result from a meeting of the minds of the parties in mutual assent to the terms.'" *Sweeten v. Trade Envelopes, Inc.*, 938 S.W.2d 383, 386 (Tenn. 1996) (citation omitted). "Courts determine mutuality of assent by assessing the parties' manifestations according to an objective standard." *Moody Realty Co. v. Huestis*, 237 S.W.3d 666, 674 (Tenn. Ct. App. 2007) (citation omitted). "[T]he meeting of the minds . . . [is] to be determined . . . not alone from the words used, but also the situation, acts, and the conduct of the parties, and the attendant circumstances." *In re Josephson*, 2012 Tenn. App. LEXIS 629, at *6 (Tenn. Ct. App. Sept. 11, 2012) (quoting *Huestis*, 237 S.W.2d at 675). "[W]hether a meeting of the minds occurred is a question of fact. However, 'when a trial court is called upon to make a finding of fact based on uncontroverted evidence, its conclusion is one of law, and the appellate courts will review that finding as a question of law.'" *Wofford v. M. J. Edwards & Sons Funeral Home, Inc.*, 490 S.W.3d 800, 807 (Tenn. Ct. App. 2015) (citations omitted). Plaintiff asserts that the Purchase Agreement in this case is not part of the Contract because Plaintiff did not see and did not sign the Purchase Agreement until after he had initiated this action. Pl.'s Mem., at 7 (citing Pl.'s Statement of Facts, ¶ 45).[3] Plaintiff instead offers the content of the e-mails as sufficient evidence of the terms of the Contract. *Id.* at 2–3 (citing Pl.'s Statement of Facts, ¶¶ 10–13).[4] In support of its contention that the Contract between the parties includes the Purchase Agreement, Defendant

---

[3] Plaintiff's Statement of Material Facts, in turn, cites to Frix Decl., ¶ 47, in support of this allegation.

[4] Plaintiff's Statement of Material Facts, in turn, cites to Frix Decl., ¶¶ 13–15, in support of these allegations.

claims it sent Plaintiff an unsigned copy of the sales quote that Plaintiff returned signed the next day by fax. Def's Resp., at 11 (citing Johnson Decl., ¶¶ 8–9). Defendant then sent Plaintiff the Purchase Agreement. *Id.* (citing Johnson Decl., ¶ 9). Plaintiff argues that Defendant cannot effectively counter the fact that Plaintiff never saw or signed the Purchase Agreement because it lacks personal knowledge and failed to explore the issue in discovery. Pl.'s Reply, at 1–2. Undaunted, Defendant advances a number of theories in support of its assertion that the Purchase Agreement controls this dispute. The Court addresses each of Defendant's arguments separately.

### 1. Performance

Defendant first argues that Plaintiff accepted the terms of the Purchase Agreement by paying Defendant the sum of $14,375 pursuant to the terms of Paragraph 11 of the Purchase Agreement. Def.'s Resp., at 12–13. The UCC has dispensed with the simpler but admittedly far more rigid common law rules of contract formation. Its provisions instead favor ease in the creation of a contract, even at the greater risk if not likelihood of ambiguity in a contract's terms. *See* Tenn. Code Ann. § 47-2-204(3) ("Even though one . . . or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy."). As such and as mentioned above, the UCC permits a contract to "be made in *any manner* sufficient to show agreement, including *conduct by both parties which recognizes the existence of such a contract*." Tenn. Code Ann. § 47-2-204(1) (emphasis added). Paragraph 11 of the Purchase Agreement states, in the relevant part, as follows:

> 11. **Payment/Acceptance.** Buyer shall be deemed to have accepted the terms of this offer by signing this agreement or by ordering the Equipment from Seller. Deposits are non-refundable. At Seller's discretion, deposits may be applied toward future equipment or service purchases.

Def.'s Resp., at 12 (quoting Johnson Decl., Ex. C) (emphasis omitted).  Defendant then recites the UCC definition of a merchant and an official comment in support of the proposition that partial performance may constitute acceptance under the UCC.  *Id.* at 13.  The Court accepts this premise as uncontroversial but remains unconvinced of the concept's applicability in this case. *See Carter v. Richards*, 1990 Tenn. App. LEXIS 899, at *9 (Tenn. Ct. App. Dec. 21, 1990) (citing *Hutchinson v. Dobson-Bainbridge Realty*, 217 S.W.2d 6 (Tenn. Ct. App. 1946)) ("The act of beginning performance of the contract indicates . . . acceptance . . . .").  While it is undisputed that Plaintiff paid Defendant a sum of money subsequent to the date that Defendant sent Plaintiff a copy of the Purchase Agreement, such performance is only indicative of the existence of the Contract and not that the Contract is governed by the Purchase Agreement.  It is just as likely that Plaintiff made payments in response to the parties' other communications.  Thus, Plaintiff's conduct after Defendant sent the Purchase Agreement is insufficient to constitute acceptance by performance.

## 2.    Course of Dealing

Defendant next raises the argument that the parties' course of dealing demonstrates that agreements similar to the Purchase Agreement always control their contracts for sale.  Def.'s Resp., at 10–11.  Under the UCC, a "course of dealing between the parties . . . is relevant in ascertaining the meaning of the parties' agreement, may give particular meaning to specific terms of the agreement, and may supplement or qualify the terms of the agreement."  Tenn. Code Ann. § 47-1-303(d).  The UCC defines a "course of dealing" as "a sequence of conduct concerning previous transactions between the parties to a particular transaction that is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and

other conduct." *Id.* § 47-1-303(b). Plaintiff, however, argues that a course of dealing cannot arise from a single transaction. Pl.'s Reply, at 2.

The Sixth Circuit does not appear to have resolved this issue. *Inmon Truck Sales, Inc. v. Peterbilt of Northwest Ohio, Inc.*, 1992 U.S. App. LEXIS 3471, at *6 (6th Cir. Feb. 24, 1992) ("[W]e need not decide whether a single sale is adequate to establish a course of dealing."). Nor, as far as the Court can tell, has the Tennessee Supreme Court. Though no binding authority is available, the Court notes that the Tennessee Court of Appeals sided with Plaintiff's position in *Remco Equipment Sales, Inc. v. Manz. See* 952 S.W.2d 437, 439 (Tenn. Ct. App. 1997) (citations omitted) (adopting the conclusion of many other courts that "a single transaction cannot constitute a course of dealing"). While "course of dealing" is historically a legal term of art, the Tennessee General Assembly has, in adopting the UCC, chosen to restrict that term to a "sequence of conduct" within the UCC's scope. Tenn. Code Ann. § 47-1-303(b). As it "must presume that [the] legislature says in a statute what it means and means in a statute what it says there," the Court fails to grasp how a single point in time could be a "sequence" in any sense of the word. *See* Sequence, *New Oxford American Dictionary* (3d ed. 2010) (defining "sequence" as "a particular order in which related events, movements, or things follow each other" or "a set of related events, movements, or things that follow each other in a particular order"). Based on the persuasive authority of the Tennessee Court of Appeals's decision in *Remco Equipment Sales* and the UCC's language in defining a "course of dealing," the Court thinks it is likely that the Tennessee Supreme Court would hold that a "course of dealing" requires a series of transactions and is not satisfied by a lone transaction. The Court so holds and accordingly finds Defendant's argument to be without merit.

### 3. UCC § 2-207

Defendant then argues that Plaintiff accepted the terms of the Purchase Agreement when he failed to provide Defendant with a written objection within ten days of receiving it. Def.'s Resp., at 12. Defendant again tangles separate provisions of the UCC. Section 2-201 provides that certain writings, between merchants, not objected to within ten days of receipt satisfy the Statute of Frauds. Tenn. Code Ann. § 47-2-201(1)–(2). But Section 2-207, known as the "battle of the forms" provision, provides for the inclusion of additional terms in an acceptance or written confirmation in a contract even though the parties had not previously discussed those terms. Tenn. Code Ann. § 47-2-207(1). This provision eased the old mirror-image rule, which required "[a]n acceptance[] to be . . . identical with the offer and unconditional." *Canton Cotton Mills v. Bowman Overall Co.*, 257 S.W. 398, 402 (Tenn. 1923) (citation omitted). Section 2-207 also provides that, between merchants, the terms can become part of the contract unilaterally in certain situations. Tenn. Code Ann. § 47-2-207(2). Thus, it appears to the Court that Defendant means to argue that the Purchase Agreement constituted a written confirmation under section 2-207.

No provision of the UCC, at least in Article 2, can match the battle of the forms provision for opportunities to ensnare parties and even the occasional court. This Court has previously invoked the Sixth Circuit's description of section 2-207 as "a murky bit of prose" and "one of the most . . . difficult [sections] in the entire [UCC], and well it may be said that the product as it finally reads is not altogether satisfactory." *Dorton v. Collins & Aikman Corp.*, 453 F.2d 1161, 1165 (6th Cir. 1972). Yet this Court agrees that section 2-207 "establishes important legal principles to be employed to resolve complex contract disputes arising from the exchange of business forms." *Mead Corp. v. McNally-Pittsburgh Mfg. Corp.*, 654 F.2d 1197, 1206 (6th Cir.

1981) (citations omitted).

> The relevant part of section 2-207 reads as follows:
>
> A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon . . . . The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless . . . they materially alter it; or . . . notification of objection to them . . . is given within a reasonable time . . . .

Tenn. Code Ann. § 47-2-207(1)–(2). It appears from the available evidence of the parties' correspondence that the Contract was formed before Defendant sent the Purchase Agreement; either during informal discussion or at the very latest when Plaintiff returned the invoice for the transaction to Defendant with his signature. *See* Frix Decl., Exs. A–B; Denholtz Decl., Ex. B. Thus, the Purchase Agreement must constitute a written confirmation that was sent within a reasonable time.[5] On its face, the Purchase Agreement purports to be just that. Defendant alleges that it faxed the Purchase Agreement with a cover letter dated May 12, 2016, which is one day after it sent an invoice to Plaintiff and within the same week that the various e-mails available to the Court were all sent. *See* Frix Decl., Exs. A–B; Denholtz Decl., Ex. C. The cover letter begins with the statement that it "is to confirm in writing . . . ." Denholtz Decl., Ex. C. But it appears to the Court that the invoice Defendant sent already satisfied this purpose. Does section 2-207 permit the parties to repeatedly rewrite the terms of their deal under the pretext of "confirmation" so long as the alterations are done in a reasonable time? The Tennessee courts have not spoken on this issue. Nor has the Sixth Circuit, or, as far as the Court can tell, any Circuit. To the Court's surprise, only three district courts have addressed the issue, and one of

---

[5] Treating the Purchase Agreement as a "definite and seasonable expression of acceptance" rather than a written confirmation would not materially alter any analysis under section 2-207.

those courts had its decision overturned on different grounds.[6]   Naturally, the remaining two courts are split on the issue.  According to the United States District Court for the District of New Jersey, "[s]ection 2-207 does not contemplate multiple written confirmations operating as acceptance, with each confirmation having the capability of adding new []or different terms." *Rocheux Int'l of N.J., Inc. v. U.S. Merchs. Fin. Group, Inc.*, 741 F. Supp. 2d 651, 679 (D.N.J. 2010).  The court reasoned that, because the first form was intended to act as an acceptance and included additional terms, the subsequently sent invoices were irrelevant.  *Id.* at 679–80.  The court also suggested that this was not really a battle of the forms since one party had sent both forms.  *Id.* at 679 n.17.  The United States District Court for the District of Utah, however, found that intervening correspondence does not preclude the addition of terms to an agreement between merchants under section 2-207.  *Monarch Nutritional Labs v. Maximum Human Performance, Inc.*, 2005 U.S. Dist. LEXIS 36000, at *13–14 (D. Utah July 18, 2005).  The court pointed to the UCC's general preference to avoid identifying precise moments in formation.  *Id.* at *14–15 (citing *Waukesha Foundry, Inc. v. Indus. Eng'g, Inc.*, 91 F.3d 1002, 1007 (7th Cir. 1996).  The court also reasoned that the subsequent correspondence was sent in a reasonable time, which is the only qualification of a written confirmation that the provision makes.  *See id.* at *16–17.  The Court, however, need not resolve this issue today.

For section 2-207 to have the effect that Defendant desires upon the Contract—the addition of the terms of the Purchase Agreement to the Contract despite the lack of evidence of Plaintiff ever having seen or agreed to them—the Contract must be "between merchants."  Tenn. Code Ann. § 47-2-207(2)(c).  "Between merchants," in the UCC, "means in any transaction with respect to which both parties are chargeable with the knowledge or skill of merchants."  *Id.* § 47-

---

[6] *See Logan & Kanawha Coal Co., LLC v. Detherage Coal Sales, LLC*, 841 F. Supp. 2d 955, 961–65 (S.D.W.V. 2012), *rev'd* 514 F. App'x 365 (4th Cir. 2013).

2-104(3).  Defendant relies on the statutory definition of merchant and Official Comment 1 to this provision in its assertion that Plaintiff is a merchant under the UCC.  Def.'s Resp., at 12 n.2 (citing Fla. Stat. Ann. § 672.104, cmt. 1) ("This Article assumes that transactions between professionals in a given field require special and clear rules which may not apply to a casual or inexperienced seller or buyer.").  Plaintiff argues that Defendant has offered no evidence that Plaintiff is a merchant within the meaning of the statute.  Indeed, Plaintiff points out that he does not deal in medical equipment and lacks particular knowledge or skill with respect to such equipment.  Reply, at 2 n.3.  Plaintiff relies on two Florida cases in support of his position.  *Id.* at 2–3 n.3.  Neither the Tennessee Supreme Court nor the Sixth Circuit has spoken to the issue of whether a physician that purchases equipment for his practice constitutes a merchant under the UCC.  As there is no binding authority upon the Court as to this issue, it begins its analysis with the statutory language of the definition.

The UCC defines "[m]erchant" as "a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction . . . ."[7]  Tenn. Code Ann. § 47-2-104(1).  No evidence before the Court suggests that Plaintiff is a seller of CT scanners or mammography equipment, so it will restrict its analysis to the latter portion of the definition.  To discern whether Plaintiff is a merchant under the UCC, the Court must decide whether Plaintiff is "a person who . . . by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction."  *Id.*  Plaintiff insists that he does not hold himself out as having such knowledge or skill.  Pl.'s Reply, at 2 n.3.  But that is not the relevant inquiry.  The definition

---

[7] The Court omitted the rest of the definition, which essentially makes the principal of an agent that is a merchant also a merchant, because the undisputed facts of this case reveal no involvement of an agent of Plaintiff.  *See* Tenn. Code Ann. § 47-2-104(1).

does not require a person who holds himself out as having a particular knowledge or skill but who does so "*by his occupation*." Tenn. Code Ann. § 47-2-104(1) (emphasis added); *see also Loeb & Co. v. Schreiner*, 321 So. 2d 199, 202 (Ala. 1975) ("[A] person cannot be considered a 'merchant' [under section 2-104] simply because he is a braggart or has a high opinion of his knowledge in a particular area.").

To Plaintiff's credit, the Tennessee Court of Appeals has adopted an individualized approach for farmers. *Brooks Cotton Co. v. Williams*, 381 S.W.3d 414 (Tenn. Ct. App. 2012). The test adopted by the court provides a nonexhaustive list of four factors for use in determining whether a *particular* farmer is a merchant based upon his own personal business sophistication. *Id.* at 425. While the decisions of the Tennessee Court of Appeals are not binding upon this Court, and this particular analysis seems applicable only to farmers, the departure in reasoning between the Court of Appeals and this Court is worth highlighting nonetheless. An individualized approach stands in stark contrast to the occupation-based approach that the language of the statute plainly calls for. The court seems to ultimately distinguish between a regular farmer and an "experienced commercial farmer[]." *Id.* at 427–28. The Tennessee Court of Appeals was faced with persuasive authority that ranged from "It is inconceivable that the drafters of the [UCC] intended to place the average farmer, who merely grows his yearly crop and sells it to the local elevator, etc., on equal footing with the professional commodities dealer whose sole business is the buying and selling of farm commodities," *Pierson v. Arnst*, 534 F. Supp. 360, 362 (D. Mont. 1982), to "This court does not believe that anyone in this day and age looks upon any person or corporation who conducts a farming operation as a simple tiller of the soil," *Rush Johnson Farms, Inc. v. Mo. Farmers Ass'n*, 555 S.W.2d 64 (Mo. Ct. App. 1977). *Brooks Cotton Co.*, 381 S.W.3d at 423–26. The court ultimately adopted its test from the

Colorado Court of Appeals, which noted an evolution in the general sophistication of the farmer. *Id.* at 425 (quoting *Colo.-Kan. Grain Co. v. Reifschneider*, 817 P.2d 637 (Colo. Ct. App. 1991)). Unless experience and sophistication are capable of dividing farmers into distinguishable occupations, however, this Court cannot reconcile an individualized test with the clear dictates of the statute. According to section 47-2-104(1), the person must hold himself out with the peculiar knowledge by his occupation rather than by his individual experience or level of sophistication. A person's occupation is his or her "usual or principal work or business, esp[ecially] as a means of earning a living." Occupation, *The Random House Dictionary of the English Language* (2d unabridged ed. 1987).[8] The novice that manages to make his living from the smallest patch of earth may call himself a farmer as much as any agricultural corporate giant. Any distinction is therefore immaterial to this Court's analysis of section 47-2-104(1). What changes from case to case are the goods or practices involved in transaction. Thus, the issue then becomes whether a physician inherently holds himself out as having knowledge or skills peculiar to medical equipment or the installation thereof.

This is of course a much narrower reading of "merchant" than Defendant argues for. But Defendant's apparent assertion that the UCC envisions merchants as encompassing all professionals is inconsistent with the statutory language, which significantly restricts the

---

[8] The Court here uses a 1987 English language dictionary for two reasons. First, the English language dictionary is appropriate in this instance rather than a legal dictionary such as *Black's Law Dictionary* because without reason to believe that a legislature intended to use a word in its technical sense, the courts are to look to "the common language of the people" to determine its plain meaning. *See Nix v. Hedden*, 149 U.S. 304, 307 (1893) (rejecting the botanical meaning of a tomato as fruit in favor of its common understanding of a vegetable when deciding whether a tomato should be taxed under the Tariff Act of 1883, which levied a ten-percent duty on vegetables but not fruit). Second, Tennessee enacted the UCC's definition of merchant in an Act of 1963, and "[d]ictionaries tend to lag behind linguistic realities . . . ." Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 419, 423 (2012) (recommending this particular edition of *The Random House Dictionary of the English Language* for 1951–2000).

knowledge or skill that would trigger the merchant provisions to such "knowledge or skill *peculiar to the practices or goods involved in the transaction.* Tenn. Code Ann. § 47-2-104(1) (emphasis added). The Tennessee General Assembly did not include the Official Comments in the provisions of 47-2-104. *United Foods, Inc. v. Hadley-Peoples Mfg. Co.*, 1994 Tenn. App. LEXIS 277, at *13 (Tenn. Ct. App. May 20, 1994) (citing Tenn. Code Ann. § 47-2-207(2) & cmt. 3) (rejecting the argument that the use by Official Comment 3 to section 47-2-207 of "additional or different terms" was applicable when section 47-2-207(2) only called for "additional terms" because "the drafters could easily have included 'or different' in [section] 47-2-207(2) if they had so intended"). Defendant would perhaps be correct in relying on the legislature's use of "practices" in hopes that "practice" is meant in the sense of "the business of a professional person." Practice, *The Random House Dictionary of the English Language* (2d unabridged ed. 1987). Defendant could then argue that Plaintiff, by virtue of being a doctor, is charged with the requisite knowledge and skill peculiar to the practice of medicine, and this is sufficient to constitute a merchant under the UCC. It is true that one such rule, known as the last-reasonable-referent canon,[9] provides that subsequent modifying language usually only modifies the closest reasonable word. *Carroll v. Sanders* (*In re Sanders*), 551 F.3d 397, 399 (6th Cir. 2008) (quoting Bryan A. Garner, *Garner's Modern American Usage* 523–24 (2003)) ("[W]hen a word . . . points back to a[] . . . referent, the true referent should generally be the closest appropriate word."); *see also Lockhart v. United States*, 136 S. Ct. 958, 962 (2016) (citing *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003); Rule of the last antecedent, *Black's Law*

---

[9] The last-reasonable-referent canon is often folded into the more commonly discussed last-antecedent canon. Scalia & Garner, *supra* note 8, at 152 ("Strictly speaking, only pronouns have antecedents, and the canon here under consideration also applies to adjectives, adverbs, and adverbial or adjectival phrases—and it applies not just to words that precede the modifier, but also to words that follow it.").

*Dictionary* 1532–33 (10th ed. 2014); Scalia & Garner, *supra* note 8, at 144) ("The rule provides that 'a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows.'"). Under that rule, it would not be unreasonable to suggest that the modifier "involved in the transaction" modifies the word "goods" but not "practices." But the rule of the last reasonable referent "can assuredly be overcome by other indicia of meaning." *Barnhart*, 540 U.S. at 26. For example, "the . . . rule does not generally apply . . . when '[t]he modifying clause appear[s] . . . at the end of a single, integrated list.'" *Lockhart*, 136 S. Ct. at 970 (Kagan, J., dissenting) (quoting *Jama v. Immigration and Customs Enforcement*, 543 U.S. 335, 344 n.4 (2005)). "'When there is a straightforward, parallel construction that involves all nouns or verbs in a series,' a modifier at the end of the list 'normally applies to the entire series.'" *Id.* (quoting Scalia & Garner, *supra* note 8, at 147). Here, the phrase "the practices or goods" is written in a parallel construction. Both words are plural, and the definite article "the" is carried over to both words. *See* Scalia & Garner, *supra* note 8, at 147 (citations omitted) ("The typical way in which syntax would suggest no carryover modification is that a determiner (*a*, *the*, *some*, etc.) will be repeated before the second element."). Thus, "involved in the transaction" modifies both "practices" and "goods," restricting the meaning of practices in the instant case to the "business of a professional person" involved in the sale or installation of medical equipment. The Court now turns to resolving whether a physician inherently holds himself out as having knowledge or skills peculiar to medical equipment or the installation thereof.

In response to Defendant's assertion that Plaintiff is a merchant under the UCC, Plaintiff cites two cases: first, *Czarnecki v. Roller*, 726 F. Supp. 832, 843 (S.D. Fla. 1989), for the proposition that a "a party who engages in only a handful of transactions with respect to a

particular good is not a 'merchant'"; and, second, *Porter v. Rosenberg*, 650 So. 2d 79, 81–82 (Fla. Dist. Ct. App. 1995), for the proposition that physicians are "more akin to the consumer or user of the product, especially where the product is not transferred to the patient but utilized incidental [sic] to the provision of medical services." Pl.'s Reply, at 2–3. The Court finds the first case irrelevant to its analysis. How often a person engages in the sales for a particular good goes to whether he is a "deal[er] in goods of the kind," a portion of the definition that clearly does not apply to Plaintiff. *See* Tenn. Code Ann. § 47-2-104(1). A person's occupation can present that person to the world as having certain knowledge regardless of how many times they actually enter into a transaction so long as the knowledge is distinctive to the practices or goods involved in the disputed transaction. *See id.* The proposition Plaintiff draws from the second case certainly makes a lot of sense, but it speaks more to a common understanding of merchant rather than the UCC's definition. Common sense and understanding, however, are what must finally decide this dispute lest the Court and the parties remain forever more entangled in the UCC's provisions. A physician, put simply, is "a person qualified to practice medicine." Physician, *New Oxford American Dictionary* (3d ed. 2010). And medicine is "the science or practice of the diagnosis, treatment, or prevention of disease." Medicine, *supra*. This practice necessarily includes the ability to use various types of medical equipment, but the ability to use a machine is not a skill peculiar to one's practice.

> Physicians, like hospitals, are providers of medical services. The physician's expertise lies in the diagnosis, treatment and cure of illness, not in the research or development of prosthetics or devices used to aid medical diagnosis or treatment. . . . Products . . . case are supplied and utilized only as needed to deliver the professional medical service. They are incidental, or integral, to a physician's service, but they are not the focus of the physician's delivery of health care.

*Porter v. Rosenberg*, 650 So. 2d 79, 81–82 (Pa. Super. Ct. 1995) (discussing health care

providers in a strict liability context). Yes, the physician is more like the consumer in these transactions. But the reason that physicians are not merchants under the UCC is that physicians are not experts in the equipment itself. There is nothing peculiar about being able to use a machine for its intended purpose. And there is no indication that physicians generally know how to take apart, put back together, install, or repair complicated pieces of machinery. Nor is there an indication that physicians can converse easily about the market for medical equipment. *Cf. Brooks Cotton Co. v. Williams*, 381 S.W.3d 414, 424–25 (Tenn. Ct. App. 2012) (holding that farmers could constitute merchants under the UCC because of their "extensive knowledge and sophistication regarding the purchase and sale of crops on the various agricultural markets"). The Court finds that a physician, by mere virtue of being a physician, does not hold himself out as having skills or knowledge peculiar to the sale or installation of medical equipment. Accordingly, the Court must conclude that Plaintiff is not a merchant under the UCC, and, therefore, the Purchase Agreement cannot be part of the Contract under section 2-207.

### 4. Admission

Finally, Defendant maintains that a demand letter sent by Plaintiff's counsel that referenced "specifications in the contract" amounts to admission of the validity of the Purchase Agreement. Def's Resp., at 14. Plaintiff, however, asserts that the demand letter is inadmissible under Fed. R. Evid. 408. Even if the letter was admissible, Plaintiff claims that his counsel was referencing e-mails from Defendant's agents during their discussions that gave rise to the Contract and not the Purchase Agreement. Assuming *arguendo* that the letter is admissible, the Court is not persuaded that it amounts to an admission of the validity of the Purchase Agreement. It is clear to the Court that Plaintiff's counsel was referencing the Contract and not the Purchase

Agreement.  *See* Denholtz Decl., Ex. C.  A contract is not a piece of paper; it is the agreement between the parties.  *See Patterson v. McClean Credit Union*, 491 U.S. 164, 221 (1989) (Brennan, J., dissenting) ("A contract is not just a piece of paper.  Just as a single word is the skin of a living thought, so is a contract evidence of a vital, ongoing relationship between human beings.").  Furthermore, when Plaintiff's counsel said "specifications in the contract," he was setting up his own replies by first speaking in the role of Defendant's agents.  *See* Denholtz Decl., Ex. C.  Therefore, the Court finds this argument to be without merit.

With no meritorious argument before it as to why the Purchase Agreement should govern the Contract, the Court concludes that the Purchase Agreement does not govern the Contract. Because the choice-of-law provision contained within the Purchase Agreement does not apply, the Court now holds what it had previously only assumed:  the Contract is governed by Tennessee law and the UCC.

### D.       Breach of the Contract

Having identified the terms of the Contract, the Court now turns to whether Defendant breached the Contract.  "A breach of contract takes place when a party fails to perform according to the agreement."  *In re Gatlinburg Motel Enterprises*, 127 B.R. 814, 819 (Bankr. E.D. Tenn. 1991) (citations omitted); *see also* Restatement (Second) of Contracts § 235(2) ("When performance of a duty under a contract is due any non-performance is a breach.").  A refusal to perform constitutes a breach if the non-breaching party treats it as such.  *Ault v. Dustin*, 45 S.W. 981, 985 (Tenn. 1897).  Under the UCC, when one party refuses to perform, the aggrieved party may resort to any remedy for breach under its provisions *and* suspend its own performance. Tenn. Code Ann. § 47-2-610.  As previously stated, Plaintiff asserts that there can be no genuine

dispute as to breach because the parties agree that Defendant refused to perform by informing Plaintiff that it would not be delivering the mammography equipment. Pl.'s Mem., at 8. Defendant argues that it was no longer obligated to perform because Plaintiff had first breached the Contract by violating the terms of the Purchase Agreement. Def.'s Resp., at 17–20. But Defendant's arguments to this effect are defeated by the Court's finding that the terms of the Purchase Agreement are not part of the Contract.[10] One argument that Defendant makes, however, is worth examining outside of the context of the Purchase Agreement.

Defendant claims that Plaintiff made misrepresentations of material facts regarding the trade-in on the 4-slice CT scanner. Def.'s Resp., at 17. According to Defendant, Plaintiff represented that the scanner "was in good working and operation condition and was still in use immediately prior to the transaction." Denholtz Decl., ¶ 14. According to Defendant, however, the scanner was in a mobile trailer that "was dirty dusty, and . . . [had] the presence of mildew []or mold. . . . [T]he air condition[er] did not work[.] [T]here were dead insects[,] . . . used syringes . . . , and . . . other trash and medical waste throughout the trailer." Childs Decl., ¶ 20. "It was obvious to [the engineer] that the mobile trailer and the . . . Scanner . . . had been switched off and without power for quite some time." Id. ¶ 21. Defendant adds that Plaintiff has refused to ship the cable set for this scanner. Def.'s Resp, at 17. Plaintiff states that this allegation "came as a surprise" because Defendant's "own contractor had inspected the scanner before shipping it to [Defendant] in Florida, and the scanner was in good working order when it was being used to scan patients . . . immediately before this project began." Frix Decl., ¶ 42.

---

[10] "The terms of the purchase agreement govern the transaction between the parties," . Def.'s Mem., at 10, ECF No. 49-4, "The terms of the purchase agreement did not include a 'turnkey' sale and installation of equipment," Id. at 15, "Plaintiff breached the terms of the Purchase Agreement," Id. at 17, and "Following Plaintiff's breach [Defendant] was entitled to retain the deposit to cover the costs Plaintiff agreed to pay under the Purchase Agreement and to cancel its performance regarding the sale of the mammography equipment," Id. at 19.

Defendant's subsequent argument is not entirely clear because it then implies that this misrepresentation was a violation of a good faith obligation under the terms of the Purchase Agreement.

Misrepresentations of material facts and breach of the duty of good faith and fair dealing are distinct concepts. While the Purchase Agreement is irrelevant here, a duty of good faith and fair dealing is implied in every contract. *Dick Broad. Co. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 660 (Tenn. 2013) (citation omitted). This duty, however, "does not apply to the formation of a contract." *Wallace v. Nat'l Bank of Commerce*, 938 S.W.2d 684, 687 (Tenn. 1996) (citation omitted). The UCC does change this principle of contract law. Tenn. Code Ann. § 47-1-304 ("Every contract or duty within [the scope of the UCC] imposes an obligation of good faith in its performance and enforcement."). Any statement by Plaintiff as to the condition of the scanner that Defendant relied on in offering credited value for the scanner would have been made in the formation of the Contract.[11] Therefore, the duty of good faith is inapplicable.

Misrepresentation, on the other hand, is a species of fraud that is based in tort. *See, e.g.*, *Stanfill v. Mountain*, 301 S.W.3d 179, 187–88 (Tenn. 2009) (quoting *Walker v. Sunrise Pontiac-GMC Truck, Inc.*, 249 S.W.3d 301, 311 (Tenn. 2008)). As such, it is most appropriately raised as a counter-claim rather than a defense to breach. When raised in contract law, misrepresentation goes to formation of the contract and can preclude a finding of the meeting of the minds. *See, e.g.*, *Scruggs v. Roach*, 1993 Tenn. App. LEXIS 257, at *9–10 (Tenn. Ct. App. Mar. 31, 1993) (citation omitted). Defendant, however, does not dispute the existence of the Contract. Defendant argues that this misrepresentation is a breach of the Contract, which it

---

[11] Defendant does not raise the issue, but the Court would also point out that, because Plaintiff is not a merchant, the sale of the 4-slice CT scanner to Defendant does not include the implied warranty of merchantability. *See* Tenn. Code Ann. § 47-2-314(1).

cannot be because the terms of the contract do not speak to the condition of the CT scanner. Further, Defendant's allegations stem from statements made before the formation of the Contract rather than from Plaintiff's performance. Therefore, misrepresentation is also inapplicable in this context.

As Defendant's arguments to the contrary are without merit, the Court finds that Defendant breached the Contract.

### E.     Damages Flowing from the Breach

Plaintiff argues that he has suffered damages as the result of Defendant's breach, specifically identifying Defendant's failure to either return his money or the four-slice CT Scanner. Pl.'s Mem., at . Defendant makes no argument in its brief on this point. In Tennessee, "[u]pon breach of a valid and binding contract, the law infers some damages . . . ." *Morristown Lincoln-Mercury, Inc. v. Roy N. Lotspeich Publishing Co.*, 298 S.W.2d 788, 795 (Tenn. Ct. App. 1956) (citation omitted). This inference recognizes that, at the very least, the nonbreaching party has suffered an infringement of its legal rights. *See Womack v. Ward*, 186 S.W.2d 619, 620 (Tenn. Ct. App. 1944). Therefore, without determining the nature and scope of the damages suffered by Plaintiff, the Court finds that this third and final element of a breach of contract claim has been established.

Accordingly, the Court concludes that Plaintiff has carried his burden under Rule 56. In response, Defendant has failed to present a dispute of material fact necessary to bring into question or otherwise negate an essential element of Plaintiff's breach of contract claim. Plaintiff has therefore demonstrated that he is entitled to judgment as a matter of law on the

single issue of Defendant's liability for breach of contract. For these reasons, the Court finds that summary judgment is appropriate.

## IV.  CONCLUSION

Because the parties do not dispute the existence of the Contract, that Defendant refused to perform under the Contract, or that Plaintiff suffered damages as a result of this refusal, and because Defendant's arguments in justification of its refusal to perform lack merit in light of the Court's holding that the Purchase Agreement is inapplicable to the Contract, Plaintiff's Motion for Partial Summary Judgment is hereby **GRANTED**.

It is so ORDERED.

**s/  S. Thomas Anderson**
S. THOMAS ANDERSON
CHIEF UNITED STATES DISTRICT JUDGE

Date:  September 20, 2017.